## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| DEGELMAN INDUSTRIES, LTD, | : | |
| Plaintiff, | : | Civil Action No. 06-CV-6346 |
| | : | |
| v. | : | **REPORT AND** |
| | : | **RECOMMENDATION ON** |
| | : | **EXPERT OPINIONS AND** |
| PRO-TECH WELDING AND | : | **REPORTS** |
| FABRICATION, INC. and | : | |
| MICHAEL P. WEAGLEY, | : | |
| Defendants. | : | |

_____

## I.    INTRODUCTION

Pursuant to the Court's Order of August 11, 2010 [Dkt. No. 118], the undersigned was appointed Special Master to, *inter alia*, issue a Report and Recommendation on the Plaintiff's motion for an Order precluding the testimony of various proposed experts and to issue a Report and Recommendation on the admissibility of certain proposed expert witnesses, namely:  Nicholas P. Godici, Alan P. Douglas, Jerre Heyer, and William M. Leonard.  Although part of a separate motion filed by Defendants,[1] this Report and Recommendation will also address the admissibility of testimony by David J. Quesnel and Anthony J. Dannible.

Having considered the parties' submissions and conducted oral argument on November 18, 2010, the following constitutes my Report and Recommendation regarding the issues presented in these motions.

## II.    BACKGROUND

The plaintiff Degelman Industries Ltd. ("Plaintiff" or "Degelman") brought this

---

[1]As part of Defendants' Motion for Partial Summary Judgment [Dkt. No. 80], Defendants moved to disqualify the testimony of David J. Quesnel and Anthony J. Dannible.

action accusing the defendants Pro-Tech Welding & Fabrication, Inc. ("Pro-Tech") and Michael P. Weagley (collectively "Defendants") of infringing Plaintiff's utility patent U.S. Patent No. 6,845,576 entitled "Materials Moving Blade" ("the '576 Patent") and design patents U.S. Patent Nos. D478,097 ("the D'097 Patent"), D519,128 ("the D'128 Patent"), and D519,129 ("the D'129 Patent"), each entitled "Snow Moving Apparatus" (collectively the "Design Patents").  Plaintiff moved for partial summary judgment on the ground that the Design Patents were infringed by snow pusher products manufactured and sold by Defendants.  During the oral argument, Plaintiff withdrew its partial summary judgment motion as to one of the accused products known as the ALB Angle Model.  [Hr'g Tr. 4:17-5:5.]  Defendants have opposed Plaintiff's motion and moved for partial summary judgment of non-infringement and invalidity.

Plaintiff, pursuant to Rule 702 of the Federal Rules of Evidence, moved for an Order from the Court precluding Defendants from introducing or relying upon, at any stage of the instant proceeding, testimony and/or documents prepared for this litigation by Nicholas P. Godici ("Godici"), Alan P. Douglas ("Douglas"), Jerre Heyer ("Heyer"), and William M. Leonard ("Leonard").  [Dkt. No. 78.]  Defendants, on the other hand, moved to preclude reports and expert testimony of David J. Quesnel ("Quesnel") and Anthony J. Dannible ("Dannible") as they relate to Defendants' alleged infringement.  [Dkt. No. 80.] Defendants also later filed a Cross-Motion [Dkt. No. 87] to altogether preclude Plaintiff from using and/or introducing testimony, reports, or other evidence and materials from Quesnel in this action.

Because the issues presented in these motions are closely related, this Report and Recommendation will address these issues together.

2

### III.   STATEMENT OF FACTS

#### A.   Plaintiff's Motion to Preclude Godici, Douglas, Heyer and Leonard

Godici and Douglas have been proffered by Defendants as experts qualified to opine on the issues of patent validity and unenforceability.  Plaintiff concedes that Godici and Douglas, who have work experience at the United States Patent and Trademark Office ("PTO"), are competent to opine as to PTO procedures that may be relevant to the issues of this case.  However, Plaintiff contends that neither Godici nor Douglas is qualified to testify about technical aspects of the devices and designs at issue and/or to provide opinions regarding the issues of validity and/or infringement.  [Dkt. No. 78-3, 4-5.]

Heyer has been proffered by Defendants as an expert to opine as an "ordinary observer" with respect to the products at issue and Plaintiff's patents.  Plaintiff contends that Heyer's testimony is not needed and invades the province of the Court and jury. [Dkt. No. 78-3, 2.]

Finally, Defendants have proffered Leonard as an expert to opine on the issue of patent validity.  Plaintiff contends that Leonard "lends nothing to the litigation process, is duplicative, and applies a wholly different standard than that instructed by the Patent Law or the courts."  [Dkt. No. 78-3, 5.]

#### B.   Defendants' Motion to Preclude Quesnel and Dannible

Plaintiff has proffered Quesnel to opine on its Design Patents, and Plaintiff has proffered Dannible to opine on the issue of its damages due to the alleged patent infringement.  Defendants have moved to preclude their testimony.

### IV.   APPLICABLE STANDARD OF LAW

In *Daubert v. Merrell Dow Pharms., Inc.*, the United States Supreme Court held that a trial court acts as gatekeeper and may permit expert testimony when the testimony is

shown to be reliable and relevant to the issues for which it is proffered. *Daubert*, 509

U.S. 579, 589 (1993); *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999)

(extending *Daubert* inquiry to nonscientific expert evidence).   Indeed, this Court "must

examine the expert's conclusions to determine whether they could reliably flow from the

facts known to the expert and the methodology used." *Heller v. Shaw Indus., Inc.*, 167

F.3d 146, 153 (3rd Cir. 1999); *see also Kumho*, 526 U.S. at 147-48; *National Football*

*League Props., Inc. v. Prostyle, Inc.*, 57 F. Supp. 2d 665 (E.D. Wisc. 1999) (precluding

survey evidence for failure to meet the *Daubert* reliability standard); *Starter Corp. v.*

*Converse, Inc.*, 170 F.3d 286 (2d Cir. 1999).

The 2000 amendments to the Federal Rules of Evidence incorporate certain of

*Daubert's* gatekeeping principles:

> If scientific, technical or other specialized knowledge will assist the trier of
> fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion or otherwise, if (1)
> the testimony is based upon sufficient facts or data, (2) the testimony is the
> product of reliable principles and methods, and (3) the witness has applied
> the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.[2]

Rule 702's relevancy standard requires a district court to assess the "fit" of the

proposed testimony; *i.e.*, whether the expert testimony is "sufficiently tied to the facts of

the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591

(internal quotations omitted).   When an expert witness relies upon invalid assumptions or

---

[2]The Court in *Daubert* suggested the following nonexclusive factors for testing the
reliability of the expert testimony at issue:  (1) whether the theory or technique proffered
can or has been tested; (2) whether the theory or technique in question has been subjected
to peer review and publication; (3) whether the technique has a known potential rate of
error and standards controlling the technique's operation; and (4) whether the theory or
technique has been generally accepted within the relevant community of experts. *Daubert*,
509 U.S. at 593-94.

demonstrates a lack of inquiry into the relevant facts, the expert witness' testimony will be precluded.  *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999).

In patent infringement cases, an expert may not testify on validity or other technical questions if the expert does not possess the underlying technical experience to provide meaningful testimony or assistance to the jury.  *See Sundance Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1363-64 (Fed. Cir. 2008).  In *Sundance*, the Federal Circuit held

> that it is an abuse of discretion to permit a witness to testify as an expert on the issues of noninfringement or invalidity unless that witness is qualified as an expert in the pertinent art.  Testimony proffered by a witness lacking the relevant technical expertise fails the standard of admissibility under Fed. R. Evid. 702.  Indeed, where an issue calls for consideration of evidence from the perspective of one of ordinary skill in the art, it is contradictory to Rule 702 to allow a witness to testify on the issue who is not qualified as a technical expert in that art.  We understand that patent lawyers are often qualified to testify as technical experts, but such a qualification must derive from a lawyer's technical qualifications in the pertinent art.

*Sundance*, 550 F.3d at 1363. The Federal Circuit went on to state:

> With regard to invalidity, for example, a witness not qualified in the pertinent art may not testify as an expert as to anticipation, or any of the underlying questions, such as the nature of the claimed invention, what a prior art references discloses, or whether the asserted claims read on the prior art reference.  Nor may a witness not qualified in the pertinent art testify as an expert on obviousness, or any of the underlying technical questions, such as the nature of the claimed invention, the scope and content of prior art, the differences between the claimed invention and the prior art, or the motivation of one of ordinary skill in the art to combine these references to achieve the claimed invention.

*Id.* at 1364.

As set forth more fully below, the proffered experts must meet the "exacting standards" of reliability and relevancy established by the Supreme Court as the benchmark of admissibility.  *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000).

## V.        THE OPINIONS AND REPORT OF GODICI AND DOUGLAS

Defendants offer both Godici and Douglas as expert witnesses to provide opinions

on the issues of invalidity and unenforceability (*i.e.*, inequitable conduct) in an effort to "assist" the Court and the jury in making decisions on these issues. Plaintiff asserts that neither Godici nor Douglas is qualified to testify on the issues of invalidity or inequitable conduct, because they each lack the requisite experience, education or training, including the possession of technical degrees and/or relevant experience in the field of art, *i.e.* material moving blades and/or snow moving apparatus.

Plaintiff concedes that Douglas and Godici, based on their PTO employment history, may testify on issues related to PTO procedure. *See Sundance*, 550 F.3d at 1364 n.7 (citing *Minn. Mining & Mfg. Co. v. Appleton Papers, Inc.*, 1998 U.S. Dist. LEXIS 22597 *4-5, No. 4-95-786 (D. Minn. June 25, 2008)) (allowing a former patent examiner with a degree in electrical engineering to testify as to PTO procedure, but not on substantive issues (*e.g.*, claim construction, infringement, or validity), because he had "not shown that he [wa]s qualified to offer opinions from the perspective of a person of ordinary skill in the relevant art").

It is noted that the standard of proof for patentability at the PTO - a preponderance of the evidence - differs from the heightened clear and convincing evidence standard that pertains to patent invalidity and inequitable conduct. Obviousness is a question of law. *Graham v. John Deere*, 383 U.S. 1 (1966). While anticipation is a question of fact and inequitable conduct, like obviousness, is based upon underlying factual findings, it is not apparent which evidentiary standard either of these witnesses applied. Nor is it apparent that either has experience applying the clear and convincing standard.

A.    **Scope of Godici's Testimony**

Godici began his career at the PTO in 1972 as a patent examiner. [Godici Aff. ¶ 4.] He also held the positions of Supervisory Patent Examiner "SPE," Group Director, Deputy

Assistant Commissioner for Patents, and Acting Assistant Commissioner for Patents before being named Commissioner for Patents by the Secretary of Commerce on March 29, 2000. [*Id.*]   As Commissioner for Patents, he was responsible for all aspects of patent-related operations at the PTO.   [*Id.*]   Godici served as the Acting Undersecretary of Commerce for Intellectual Property and Director of the PTO from January 2001 to December 2001.   [*Id.* at ¶ 3.]   As Acting Undersecretary of Commerce for Intellectual Property and Director of the PTO, he reported to and advised the Secretary of Commerce on all intellectual property matters and was responsible for all managerial aspects of the PTO.   [*Id.* at ¶ 5.]   During his time at the PTO, Godici examined approximately 7000 patent applications.   [*Id.*]   Godici holds a Bachelor of Science degree in Engineering Mechanics from Pennsylvania State University, awarded in 1972, and a Certificate of Advanced Public Management from The Maxwell School of Citizenship and Public Affairs, Syracuse University, in 1999.   [*Id.* at ¶ 6.]   Godici has a total of 36 years of experience in the patent field.   [*Id.* at ¶ 3.]   It is acknowledged that Godici spent part of his career reviewing patents related to the field of metal welding.

Defendants argue that Godici has a wealth of experience in the art to which the claimed subject matter pertains, and has the capability of understanding the scientific and engineering principles applicable to the pertinent art.   [Dkt. No. 92, Defs.' Opp'n, 6.]   Godici may have the "capability" to understand this technology, but he must be qualified as a technical expert in that art in order to opine on the issues of validity and/infringement.   *See Sundance*, 550 F.3d at 1363.   Godici seeks to provide expert opinions as to the "rules, practices, and procedures" before the PTO related to patent prosecution, and further states that he will testify as to "the significance of various documents filed by the Applicants and actions by the USPTO during the prosecution of the patents."   [Godici Aff. ¶¶ 1, 10;

Godici Tr. 37:6-14.]  However, his specific opinions go much further.  Specifically, Godici seeks to opine:

- that the inventive entities of the patents-in-suit are not correct [Godici Aff. ¶ 63];

- that Plaintiff and its representatives failed to disclose material information to the PTO [*id.* at ¶ 77]; and

- that the patents-in-suit are anticipated and/or obvious in light of prior art [*id.* at ¶¶ 106-107].

Defendants provide no evidence that Godici is an expert in the field of material moving blades or snow moving apparatus as set forth in the patents-in-suit.  Defendants acknowledged at oral argument that Godici did not review this Court's Markman Construction, which was available to him, prior to rendering his opinions.  [Hr'g Tr. 96:5-97:1.]  For instance, on the issue of the inventive entity, Godici makes conclusory statements that Degelman failed to identify the correct inventive entity, thereby rendering the patents invalid, without first considering the claim construction of the Court.  [Godici Aff. ¶ 73; *see generally* ¶¶ 62-73.]  While Godici may testify about PTO procedures regarding inventive entities, declarations, and other procedural issues, he may not usurp the role of the jury.  This type of opinion testimony could mislead and confuse the jury, and further seeks to "invade the province of the court to determine the applicable law and to instruct the jury as to that law."  *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988) (quoting *FAA v. Landy*, 705 F.2d 624, 632 (2d Cir.), *cert. denied,* 464 U.S. 895 (1983)); *see also, Bausch & Lomb, Inc. v. Alcon Lab., Inc.*, 79 F. Supp. 2d 252, 257-58 (W.D.N.Y. 2000) (excluding expert opinions regarding invalidity).

Similarly, Godici states that documents in Plaintiff's records are prior art and undisclosed material information in rendering an opinion that Plaintiff and its patent attorney engaged in inequitable conduct.  [Godici Aff. ¶¶ 105-107.]  Godici has no

personal knowledge of the materials and instead relies upon information from others. While an expert may opine in reliance upon testimony of others, here the very nature of those materials is in dispute.   Specifically, the Daniels pull plow and the Tenco snow blower are not admitted prior art.   Affidavits to support summary judgment must be based upon personal knowledge and contain evidence otherwise admissible.   Fed. R. Civ. P. 56(e).   While Godici may provide information or insight into what constitutes "material" information and how that information is handled by the PTO, here he instead proposes to opine on the issue of inequitable conduct.   Inequitable conduct, while factually intensive, is an issue that is tried to the court and not the jury[3].   *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1190 (Fed. Cir. 1993).   The Court does not require Mr. Godici's opinion on inequitable conduct.

Godici testified that "[t]he Daniels plow was clearly 'prior art' to the invention in the patents-in-suit…." [Godici Aff. ¶ 105.]   He has no personal knowledge of the Daniels plow, however.   Then, Godici opines that claims 1-9 of the '576 Patent are either "anticipated" by the Daniels plow or rendered "obvious" by the Daniel plow taken in conjunction with other prior art.   [*Id.* at ¶¶ 105-107.]   As previously noted, Godici did not take into account the Court's Markman construction.   It is inexplicable for him to opine on patent validity without at least considering the Court's claim construction.

It is significant to note that Godici's opinion on the validity of claims 3, 4, 7 and 8 of the '576 Patent does not address the four factors set forth by the Supreme Court's *Graham v. John Deere* decision.   *See KSR Int'l v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007) (citing *Graham* 383 U.S. at 17).   Godici opines that these claims are invalid based on

---

[3]Inequitable conduct requires not only a finding that material information was known and withheld from the PTO, but that it was withheld with an intent to deceive the examiner. *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995).

obviousness in a single paragraph, but does not analyze the scope and content of the prior art, the level of skill in the art, or the secondary considerations of non-obviousness. [Godici Aff. ¶ 107.]

As the Federal Circuit in *Sundance* held, an expert cannot provide testimony on issues regarding what a piece of prior art teaches or renders obvious if the expert does not have expertise in the relevant field of art. *Sundance*, 550 F.3d at 1363. While Godici's technical degree is in materials science, he has not practiced as an engineer, he never received his professional engineer license, and he does not have any certifications or other training as an engineer after receiving his Bachelors of Science in 1972. [Godici Tr. 12:12-20.] Godici claims no special skill related to material mover blades whatsoever. Godici fails to qualify as an expert in this technical field and thus, based upon the Federal Circuit's *Sundance* decision, it is recommended that he not testify on validity or inequitable conduct. *See also, Hypertherm, Inc. v. Am. Torch Tip Co.*, 2009 U.S. Dist. LEXIS 22774, *14-17, No. 05-cv-373-JD (D.N.H. Feb. 27, 2009) (excluding Ph.D. mechanical engineer from testifying as an expert because he lacked experience in the relevant field of art).

Further, patents are presumed valid. 35 U.S.C. § 282. While that presumption may be rebutted, clear and convincing evidence is required. *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1564 (Fed. Cir. 1997). At no point in his affidavit does Godici refer to this evidentiary standard. At oral argument Defendants acknowledged that it was unclear whether Godici had applied the clear and convincing standard or the lower preponderance standard used by the PTO for patentability determinations.

A jury may be apt to rely on Godici's testimony, despite his lack of underlying technical experience, because of his credentials as an administrator in the PTO. Moreover,

Godici attempts to provide expert testimony and opinions on the legal standard of validity and inequitable conduct.  Godici is not an attorney and has no legal training other than the training offered internally by the PTO.  [Godici Tr. 9:19-10:14.]  Godici claims no experience or expertise in the legal standard for validity before this Court, which differs from the legal standard for patentability before the PTO.[4]  Accordingly, to allow Godici to testify on any issue, other than strict PTO procedures, would be improper given the Federal Circuit's decision in *Sundance*.  It is therefore recommended that Mr. Godici's testimony be limited to practice and procedure before the PTO.

### B.   Scope of Douglas' Testimony

Plaintiff argues that Douglas' opinions and report should be precluded because he does not have the requisite technical background in the art, his opinions are untrustworthy, and his opinions are conclusory and go to the ultimate issue of obviousness.

Douglas has spent his entire career as a patent examiner for the PTO.  [Douglas Aff. ¶ 4.]  He began as a Design Patent Examiner in 1966, and was promoted to Full Signatory Design Patent Examiner in 1973.  [*Id.* at ¶ 5.]  From 1992 until 2007, Mr. Douglas served as the Supervisory Patent Examiner.  [*Id.*]

Like Godici, Douglas proposes to offer expert opinions as to the "practices, and procedures" before the PTO related to design patent prosecution.  [*Id.* at ¶ 1.]  However, Douglas also proposes to provide opinions on the validity of the Design Patents and whether Degelman and its patent attorney engaged in inequitable conduct.  Douglas proposes to opine:

- that the Design Patents at issue are indefinite [*id.* at ¶ 22];

---

[4]The standard for patentability at the PTO requires proof by a preponderance of the evidence which differs markedly from a patent infringement case which employs the heightened clear and convincing evidence standard.

- that Plaintiff and its patent attorney failed to disclose material information to the PTO [*id.* at ¶ 32]; and

- that the patents-in-suit are anticipated and/or obvious in light of prior art [Douglas Report ¶¶ 46-49].

As with Godici's opinions, Douglas proposes to provide opinions and conclusions on the ultimate issues, usurping the fact finder's role. He claims no technical background or expertise in the art of material moving blades. Evidence shows that, like Godici, Douglas did not review this Court's Markman Construction, which was available to him, prior to rendering his opinions in this matter. [Hr'g Tr. 96:5-97:1.] Like Godici, Douglas does not present any evidence of first-hand knowledge of the prior art at issue. He apparently relied on the representations made by Defendants to form his opinions.

Douglas also fails to show any experience as an individual with the requisite level of skill in the art of material moving blades. Douglas' college degree was in "communications, arts". [Douglas Tr. 12:6-7; Douglas Aff. ¶ 6.] Mr. Douglas' practical experience in examining design patents was in the field of nautical and aeronautical vessels. He occasionally examined design patent applications directed to hand tools. [Douglas Tr. 16:19-17:10.] Mr. Douglas does not claim to hold any specialized training and/or certifications qualifying him to testify as one skilled in the art on the issues identified in his Report. [Douglas Aff. ¶¶ 4-6; Douglas Tr. 9-17.]

Douglas' Report provides conclusory opinions that Degelman's Design Patents are indefinite and/or invalid, which go beyond mere assistance to the jury, to wit, he testified

> [t]*here is no doubt in my mind that* if the applicants had suggested anywhere in their applications that the triangular-shaped gusset was three-dimensional and comprised more than one planar surface, the examiner would have required another drawing to provide complete disclosure of the claimed design.

[Douglas Rep. ¶ 22 n.13 (emphasis added).]

As to indefiniteness, it is not clear from the record whether Douglas applied the clear and convincing legal standard for establishing invalidity as opposed to patentability before the PTO.  [Douglas Tr. 104:7-8.]  His testimony and opinions in this regard are likely to mislead the jury by relying on a standard for the patentability of design patents, which differs from the clear and convincing standard for invalidity and is inapposite in this action.  The potential for confusion for the jury is shown by the following testimony from Douglas:

> [E]ven though I have no experience with the subject of invalidity, how could – I have to come to the conclusion, without even being qualified, that how can a patent be valid if it doesn't satisfy the requisites of the statute for patentability.

[*Id.* at 104:14-20.]

Douglas' opinions and proposed testimony would be confusing to the jury because his testimony on obviousness states that "there was at the time … the design applications[] were filed[] prior art[] which could be seen to make a prima facie case that the appearances claim in each of the applications as filed would have been obvious to someone with ordinary skill in the art."  [*Id.* at 103:11-21.]  The standard to establish invalidity is the clear and convincing evidence standard, but Douglas appears to have applied the lower preponderance standard used by the PTO.  Additionally, Douglas opines that the patents are invalid due to obviousness, but admits that he has "no expertise with the subject of validity."  [*Id.* at 104:1-5.]  Douglas confirmed that he is not an attorney and does not in fact know the standard for proving invalidity of a patent.  [*Id.* at 70:21-71:8.]

It is telling that Douglas characterizes his obviousness opinion from the standpoint of an examiner, where the standards for patentability differ from the standards for validity.  Mr. Douglas states,

> [i]n my opinion, if an examiner saw the Orsolini/Daniels plow, the examiner

> would have concluded that it was obvious for this type of design to be
> incorporated into a box or containment type of snow removal apparatus,
> such as the *Avalanche* apparatus.  Therefore, the combination of Avalanche
> and the gusset depicted in the Orsolini/Daniels plow would have led me to
> reject each of the three design patents.

[Douglas Aff. ¶ 47.]

Here, a jury may be apt to rely on Douglas' testimony, despite his lack of underlying technical experience and experience with the proper legal standard for invalidity, because of his credentials as an examiner at the PTO.  Moreover, Douglas seeks to provide expert testimony and opinions on the legal standard of inequitable conduct.  Douglas is not an attorney, and has no legal training other than the training offered internally by the PTO.  Accordingly, to allow Douglas to testify on any issue, other than PTO procedures, would be improper given the Federal Circuit's decision in *Sundance.*

Based on the foregoing, it is recommended that Messrs. Godici and Douglas be precluded from testifying on issues of invalidity (including definiteness, anticipation and/or obviousness) and inequitable conduct, but may provide testimony on PTO practice and procedures.

## VI.    THE OPINIONS AND REPORT OF HEYER

Plaintiff seeks to preclude the testimony of the Defendants' expert witness Mr. Jerre Heyer.  Defendants offered Heyer as an expert qualified to testify as to the reference point of an ordinary observer of material moving blades, in particular snow moving apparatus.  Heyer describes how he undertook to compare all of the figures in each of the Design Patents to corresponding views of each of the allegedly infringing products in order to evaluate the overall visual appearance of both the patented designs and the allegedly infringing products.  [Heyer Rep. ¶¶ 18, 23, 33.]  Attached as an exhibit to Heyer's Report is a complete set of the drawings for each of the Design Patents, together with

14

corresponding images of the Pro-Tech model pushers which Plaintiff accuses of infringement.  For each of the model pushers at issue, Mr. Heyer performed essentially the same fundamental analysis to conclude that none of the accused devices infringes any of the Design Patents.

Plaintiff argues that Heyer's testimony is improper and should be disregarded because, according to Plaintiff: (1) Heyer's testimony invades on the province of the Court and jury; (2) Heyer's testimony is biased; and (3) Heyer applied the wrong test for design patent infringement.  [Dkt. No. 78-3, 2, 12-15; Dkt. No. 89, Pl.'s Opp'n, 5.]  These arguments are addressed in turn.

With respect to the first argument raised by Plaintiff, I agree with Plaintiff that Mr. Heyer should not be allowed to opine on the ultimate issue of infringement because the issue is for the fact finder alone to decide.  Moreover, Defendants acknowledge Heyer is not a patent law expert and he is not being offered to testify as a patent law expert.  Further, Heyer has not conducted a proper analysis under *Egyptian Goddess, Inc.* v. *Swisa, Inc.*, 543 F.3d 665, 672 (Fed. Cir. 2008) (*en banc*) for determining the ultimate issue of infringement. Heyer testified that the type of substantial similarity required for design patents is a "direct copy."  [Heyer Tr. 89:3-10.]  This is not the appropriate standard for determining design patent infringement.  *Egyptian Goddess*, 543 F.3d at 678 ("Under [the ordinary observer] test …, infringement will not be found unless the accused article 'embod[ies] the patented design or any colorable imitation thereof'") (citation omitted).

However, this does not mean that Mr. Heyer is incapable of assisting the fact finder in making the ultimate determination.  Heyer's testimony as an "ordinary observer" may assist the Court and fact finder in considering the experience of an ordinary observer in deciding whether the Defendants' products infringe the Design Patents.  [Heyer Rep. ¶¶ 20,

22, 29, 31, 35, 37.]  While Heyer's lack of understanding of patent law precludes him from testifying to the ultimate determination of infringement, the admissibility of his factual testimony regarding similarities/dissimilarities between the Design Patents and the accused products seems to be particularly useful to a trier of fact without invading the province of the Court or jury.

With respect to Plaintiff's second argument, Plaintiff attacks the qualifications of Mr. Heyer as an expert and accuses him of "unbridled advocacy" on the issues.  [Dkt. No. 89, Pl.'s Opp'n, 5.]  It is my opinion that Heyer is qualified to provide testimony about the appearance of the products at issue and to compare the accused products to what is illustrated in the Design Patents.  Heyer is in the business of selling and servicing plows, such as the ones at issue.  He also for a period of time operated a snow plow business.  [Heyer Rep. ¶ 6.]  He testified to at least 30 years of experience with snow plows in one form or another.  [*Id.* at ¶¶ 2-9.]  Heyer has been a member of the Snow and Ice Management Association (SIMA) almost since its inception.   He receives SIMA publications; he attends the annual meetings; and he has served as a presenter at an SIMA meeting.  [*Id.* at ¶ 11.]  Heyer seems to have the very credentials required to be or at least opine as to an "ordinary observer."  *See Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1322 (Fed. Cir. 2007).  As for alleged bias and so-called "unbridled advocacy" on the issues, Plaintiff will have the right to cross-examine Mr. Heyer at trial.

Plaintiff's third argument is that Mr. Heyer applied the wrong test for design patent infringement.  While it is true that Mr. Heyer applied the incorrect standard in arriving at his ultimate determinations of non-infringement, Plaintiff fails to offer testimony from an expert or ordinary observer creating a genuine dispute of material fact with Heyer's factual testimony about the various views in the patents and the comparisons to the accused

products[5].  Plaintiff makes a single reference to the testimony of Dr. Quesnel with respect to validity, but not infringement.   Dr. Quesnel presumably testified on the issue of infringement, but Plaintiff chose not to submit or rely on his testimony for purposes of opposing Defendants' Motion and the specific issue of infringement.

Plaintiff's argument concerning the application of the wrong design patent infringement standard by Mr. Heyer is addressed above, and is largely alleviated by precluding Mr. Heyer from testifying on the ultimate issue of infringement.   Plaintiff's argument that Mr. Heyer is attempting to improperly dissect the claims of the Design Patents by focusing on minute differences is not persuasive.  Mr. Heyer has examined each view to evaluate what is illustrated from the point of view of an ordinary observer.  *See Crocs, Inc. v. International Trade Comm'n,* 598 F.3d 1294, 1304 (Fed. Cir. 2010).  Mr. Heyer's analysis includes a review of each figure of each Design Patent and a comparison of the reviewed figure with a corresponding view of each accused product in order to evaluate the overall impression of the patented design and the allegedly infringing products.  [Heyer Rep. ¶¶ 18, 23, 33.]  This does not amount to element-by-element comparison, as the Plaintiff suggests. In order to achieve an overall comparison of the patented designs and the allegedly infringing products, each drawing of each patent must be compared to the corresponding view of each allegedly infringing product.  *See Crocs*, 598 F.3d at 1304; *Wing Shing Prods. (BVI) Co. v. Sunbeam Prods., Inc.*, 665 F. Supp. 2d 357, 368 (S.D.N.Y. 2009), *aff'd*, 374 F.App'x. 956 (Fed. Cir. 2010) (stating that failure by an expert to examine all views when opining on infringement is "problematic" and "at best conclusory"); *Contessa Food Prods., Inc. v. Conagara, Inc.*, 282 F.3d 1370, 1378 (Fed. Cir. 2002) (stating that design infringement analysis must include a review of all figures of a design patent).  Otherwise, an

_____

[5]Plaintiff relies almost exclusively on its partial summary judgment motion in its

overall visual impression of the products cannot be obtained.

While Plaintiff faults Mr. Heyer for improperly dissecting the Design Patents, Plaintiff seemingly proposes to consider only the gussets for determining infringement of each of the Design Patents.  [Hr'g Tr. 10:16-21.]  In so doing, Plaintiff has implicitly relied on the now-discarded point of novelty test, at least with respect to the D'097 Patent and the D'129 Patent.

Plaintiff also argues that an expert is not necessary for carrying out an analysis of Plaintiff's Design Patents and the accused products because the technology at issue, a snow moving apparatus, is a "simple consumer product," and the ordinary observer is the general public.  [Dkt. No. 78-3, 5.][6]  However, the Federal Circuit has defined the "ordinary observer" as:

> not any observer, but one who, with less than the trained facilities of the expert, is 'a purchaser of things of similar design,' or 'one interested in the subject' one who, though not an expert, has reasonable familiarity with such objects, and is capable of forming a reasonable judgment when confronted with a design therefor as to whether it presents to his eye distinctiveness from or similarity with those which have preceded it.

*Arminak*, 501 F.3d at 1322.

Defendants respond by contending that the products in this case differ markedly from ordinary consumer goods, such as the coffee makers of *Wing Shing*, because the ordinary observer of commercial containment plows is not the same as an average retail shopper of, for example, a coffee maker.  Defendants' evidence leads me to conclude that the ordinary consumer of the type of snow moving apparatus claimed in the Design Patents is more discerning than an average retail shopper.  According to the record, containment plows are

---

opposition to Defendants' Motion.  [*See* Pl.'s Opp'n, 4 n.1.]

   [6]For example, Plaintiff states, "neither the Court, nor a jury … needs an expert to help it with its aesthetic observation.  Both the Court and the jury are more than qualified as ordinary observers of snow plows, and to assess whether the overall ornamental features

not "consumer goods" of average consumers, even for those average consumers who live in upstate New York and likely will constitute at least part of the jury pool.  For example, the majority of the affiants and experts in this case, save Mr. Heyer, seemingly have never operated, sold or purchased a containment plow.  For reasons explained above, Mr. Heyer's testimony is helpful to educate the jury as to the nature of an "ordinary observer" with respect to the issue of design patent infringement.  Indeed, while Plaintiff would have the Court or me, with little to no expertise in this technological field, apply the ordinary observer test, it asks that Mr. Heyer, with much more experience and expertise as to ordinary observers of snow moving apparatus, be precluded from testifying about the Design Patents and the accused products.

Based on the foregoing, it is recommended that the testimony of Mr. Heyer as an ordinary observer be permitted to assist the Court and the jury regarding the experience of an ordinary observer, the appearance of the accused products, the appearance of the apparatus illustrated and claimed in the Design Patents, and the similarities and differences between them.  It is further recommended that Mr. Heyer be precluded from testifying on the ultimate issue of infringement and that all statements contained in his Report as to the ultimate issue of infringement not be considered.

## VII.   THE OPINIONS AND REPORT OF LEONARD

Defendants proffer Leonard to testify that (1) he is a person of skill in the art "particularly in relation to product development, mechanical design and fabrication;" and that (2) the patents at issue would have been obvious to one skilled in the art based upon his knowledge or alternatively over certain references.  According to Plaintiff, Leonard is not a person having skill in the relevant field of art, uses methodologies not shown to be

appear similar."  [Dkt. No. 89, Pl.'s Opp'n, 2.]

reliable in the art, and applies the wrong standards and burdens in his analysis. As such, Plaintiff seeks to preclude Leonard from testifying at trial as such testimony could mislead or confuse the jury.

As the Federal Circuit held *in Sundance,* one who is not skilled in the relevant field of art is not competent to testify on the issues of invalidity or infringement due to lack of expertise. Patents are written for and to be understood by persons skilled in the art. *Sundance, 550* F.3d at 1363-64; *Hypertherm,* 2009 U.S. Dist. LEXIS 227744, at *14-17. In *Hypertherm*, a New Hampshire district court found that a Ph.D. mechanical engineer lacked the requisite technical experience to act as an expert because he did not have specific design experience with the technology at issue. The district court excluded the expert and precluded his testimony. *Hypertherm,* 2009 U.S. Dist. LEXIS 227744 at *17.

According to the record, Mr. Leonard holds an Associates of Applied Mechanical Science and Mechanical Technology degree as well as a Bachelors of Science degree in Mechanical Engineering. [Leonard Aff. ¶ 3.] Mr. Leonard has taught undergraduate and graduate courses relating to new product design, welding and failure mechanics since 1998. [*Id.* at ¶ 3, Ex. A.] Mr. Leonard has also taught numerous courses that establish his experience with the design and fabrication of welded joints, including courses relating to different aspects of welding, and the engineering design and development aspects associated therewith. [*Id.*]

Mr. Leonard claims some personal experience with plows, material moving blades for use with heavy equipment vehicles, and apparatus for moving snow. Mr. Leonard testified that he previously consulted as a technical expert in a product liability matter with regard to a Tenco snow plow used on a plow truck. [Leonard Tr. 8:18-12:12.] Mr. Leonard further testified as to having an interest in mechanical devices including snowplows and

snow pushers, including observing them in operation.  [*Id.* at 24:6-26:5, 83:19-84:14.]  Mr. Leonard indicated that he has fabricated products, including a support structure for a car and performed repairs on his own equipment.  [*Id.* at 43:16-44:7.]  This knowledge may provide some degree of experience and perhaps an expertise in some technologies, but the issue remains whether they qualify Leonard as a technical expert in this case with respect to snow moving apparatus technology.

According to Plaintiff, Leonard lacks the requisite skill and knowledge to act as technical expert in the present litigation.  As the patents-in-suit apply to material moving blades in general, and snow pushers in particular, Plaintiff argues that a person would require skill in these types of devices to qualify as a "person of ordinary skill in the art." Plaintiff argues Leonard lacks such qualifications.  [*See* Leonard Aff. ¶¶ 2-4.]  Defendants disagree, pointing to Leonard's experience in camera manufacturing and electronic product ideation.  [Leonard Tr. 28:8-10, 31:3-8, 44:2-13.]  Specifically, Leonard worked as a drafter designer at Eastman Kodak, creating production tools.  [*Id.* at 28:8-19.]  Thereafter, he worked in creating prototypes and parts for cameras, shutters and other assembly components.  [*Id.* at 28:20-24, 30:3-7.]  While at Kodak, Leonard was an inventor on camera-related patents.  [*Id.* at 38:14-39:17.]  Thereafter, Leonard started his own business assisting with designing, developing, and fabricating products for third parties, which were either camera components or electrical parts.  [*Id.* at 31:17-21, 33:2-3.]

After working at Kodak, Leonard began teaching and obtained other higher education degrees.  [*Id.* at 34:10-11, 38:9-11.]  While Leonard received a Bachelor of Science in mechanical engineering, his Masters in Science was in "Cross-disciplinary Professional Studies", which he describes as "statistics, product and production operation systems and business."  [*Id.* at 34:10-11, 38:9-11.]

Leonard dedicates more than 5 pages of his Report describing his "Product Ideation Process" and then, based on the ideation process, Leonard concludes that "it would have been an obvious or predictable outcome for someone like myself, and those of skill in the art of designing snow moving equipment … to modify existing … plow designs and replace downwardly-sloping structural reinforcements with a triangular or wedge-shaped gusset design." [Leonard Rep. ¶ 21.]

Leonard implicitly acknowledges that he is not one of skill in the art by stating that it would have been obvious "for someone like myself, and those of skill in the art of designing snow moving equipment …" [*Id.*] Moreover, Leonard applies a hindsight reconstruction analysis in reaching his conclusion. [*See generally* Leonard Rep. ¶¶ 15-21.] It is well established that "courts should not succumb to hindsight claims of obviousness." *In re Kubin*, 561 F.3d 1351, 1359 (Fed. Cir. 2009); *see also Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 997 (Fed. Cir. 2009).  In other words, the claims may not be used as a guide for modifying the prior art.  Instead, there must be some articulable basis for concluding the claims obvious.  Most inventions are based upon that which preceded them.  *KSR*, 550 U.S. at 418-19.

Additionally, this Court must assess whether Leonard's testimony regarding his ideation analysis is the product of reliable principles and methods.  *See Daubert*, 509 U.S. at 593-94 (providing the nonexclusive factors for testing the reliability of the expert testimony); *see also National Football League*, 57 F. Supp. 2d at 668-69 (precluding survey evidence for failure to meet the *Daubert* reliability standard).

Here, there is no evidence that Leonard's ideation analysis has been tested, subject to peer review, whether it has known rates of error, or whether it has been accepted within the relevant community of experts.  Leonard does not reference any studies, articles or the

like directed to the ideation process he claims to have applied.   Therefore, it is recommended that Leonard's ideation analysis be precluded.

Regarding anticipation and/or obvious of the '576 Patent, it is again noted that there is no evidence that Mr. Leonard was ever provided the Court's Markman construction or that he considered the Court's Markman construction in his analysis of invalidity of the '576 Patent.   This fact alone raises serious questions regarding the reliability of Leonard's Report and the opinions he reached.

Leonard's technical background is lacking in adequate experience in manufacturing material moving blades or product development in that area.   From 1989 to 2009, Leonard's company assisted its customers in the design and development of electronic components, subassemblies and prototypes.   [Leonard Tr. 32:24-33:3.]   When questioned whether his company ever designed, developed or otherwise fabricated products in the snow removal industry he answered "No."   [*Id.* at 33:7-9.]   When asked whether he had used the ideation process for the materials moving industry or snow removal equipment industry, he again answered "No."   [*Id.* at 46:6-15.]

Leonard, therefore, fails to possess the technical experience related to material movers or snow moving equipment sufficient to qualify him as an expert or ordinary observer in the art of material moving blades.   His opinions will not render assistance to the jury in deciding whether the claimed inventions would have been obvious to a person of ordinary skill in the relevant art.   As such, it is therefore recommended that Leonard be precluded from presenting testimony and opinions on the issue of patent validity.

However, Mr. Leonard's training and education qualify him as an expert pertaining to the design and fabrication of reinforcing members for reinforcing welded joints and it is recommended that he be allowed to testify on these issues to the extent they are relevant to

issues of this case.

## VIII.  **THE OPINIONS AND REPORTS OF QUESNEL AND DANNIBLE**

As part of Defendants' Motion for Partial Summary Judgment filed October 23, 2009, Defendants moved to exclude the Reports of Quesnel and Dannible and their testimony as to various matters.  [Dkt. No. 80.]  On November 23, 2009 – a month after the Court's deadline to file motions to preclude experts -- Defendants filed a Cross-Motion to preclude the testimony, reports, and other evidence and materials of Dr. Quesnel.  [Dkt. No. 87.]

### A.      **David J. Quesnel, Ph.D.**

### 1.      **Timing of Cross-Motion**

Plaintiff asks the Court to deny Defendants' "Cross-Motion" because it was untimely.  The following facts show the various deadlines and motions related to Quesnel's Report and testimony.

This Court entered an Order on August 24, 2009 requiring that all motions to preclude experts be filed on or before October 23, 2009.  [Dkt. No. 74.]  On the October 23, 2009 deadline, Plaintiff filed a Motion for Partial Summary Judgment [Dkt. No. 77] and a Motion to Preclude Defendants' Experts [Dkt. No. 78.]  Also on the October 23, 2009 deadline, Defendants filed a Motion for Partial Summary Judgment and Motion to Disqualify Quesnel and Dannible as experts.  [Dkt. No. 80.]  Defendants requested the following relief in their motion:

> excluding the report and expert testimony of plaintiff's expert, David J. Quesnel, Ph.D., *insofar as his report and/or anticipated testimony will address the alleged infringement by the defendants of the design patents*, upon the grounds that:  (1) he does not qualify as an expert in that area, (2) his methodology was flawed because he lacked the necessary data to complete his analysis and (3) his opinions were based upon conclusory assumptions rather than technically valid observations; and

excluding the report and expert testimony of plaintiff's expert, Anthony F. Dannible, CPA, insofar as his report and/or anticipated testimony will address plaintiff's claim for lost profits, upon the grounds that: (1) his methodology is flawed because he employed incorrect data and (2) his opinions are based upon conclusory assumptions rather than appropriate research and investigation.

(Emphasis added).

On November 23, 2009, the parties filed their respective oppositions in response to the motions for partial summary judgment and Plaintiff's motion to preclude Defendants' experts. On the same date, Defendants filed the aforementioned Cross-Motion [Dkt. No. 87] to preclude Plaintiff "from using and/or introducing testimony, reports, or other evidence and materials from plaintiff's expert, David J. Quesnel, Ph.D., during the proceedings in this action." In its moving brief,[7] Defendants explained that Dr. Quesnel should be precluded from testifying as to the issues of infringement and invalidity altogether on the ground that he was unqualified. [Dkt. No. 92, 13.]

Plaintiff objected to the Cross-Motion as untimely on several grounds, most significant of which was that Defendants filed their Cross-Motion a month after the Court's October 23, 2009 deadline. [Dkt. No. 95, 9.] Defendants filed a reply [Dkt. No. 106] arguing that the Cross-Motion was timely because the Court's August 24, 2009 Order did not specifically address cross-motions [Dkt. No. 106]. Defendants further argue that the Court has discretion to accept Defendants' Cross-Motion, and that Defendants have demonstrated "good cause" "and excusable neglect" under Fed. R. Civ. P. 6(b). [*Id.*]

In my opinion, in the exercise of its discretion, the Court should consider Defendants' Cross-Motion on its merits because Defendants' Reply Memorandum [Dkt. No. 106] demonstrates good cause and legitimate excuse for not timely filing its Cross-Motion

---

[7]Defendant combined its moving brief in support of its Cross-Motion with its Memorandum of Law in opposition to Plaintiff's motion to preclude Defendants' experts.

by October 23, 2009, and a lack of undue prejudice.[8]

### 2.   Scope of Quesnel Testimony

"Design patents typically are claimed as shown in drawings." *Arminak*, 501 F.3d at 1319.  After construction of the patent's claim, the Court is to compare the construed claim to the accused design.  *Id.* at 1320 (citing *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995)).  "In determining infringement of a design patent, the Court is not limited to the ornamental features of a subset of the drawings, but instead must encompass the claimed ornamental features of all figures of a design patent."  *Id.*  In comparing the patented and accused designs, the "ordinary observer" test is employed, which was first annunciated by the Supreme Court in *Gorham* and was affirmed recently by the Federal Circuit sitting *en banc* in *Egyptian Goddess*.

The ordinary observer test requires "an objective evaluation of the question of whether a hypothetical person called the 'ordinary observer' would find substantial similarities between the patented design and the accused design so as to be deceived into purchasing the accused design believing it is the patented design."  *Arminak*, 501 F.3d at 1321 (citing *Gorham,* 81 U.S. 528).  "To be effective, a design patent protection must focus upon observations 'by ordinary observers by those who buy and use' the article bearing the design in question.'"  *Id.* at 1322.  The focus of the ordinary observer test is "on the actual product that is presented for purchase, and the ordinary purchaser of that product."  *Id.*  As previously noted, the "ordinary observer" has been defined as "not any observer, but one

---

[8]My decision to consider Defendants' Cross-Motion is entirely consistent with my separate decision to grant Plaintiff's motion to strike the Affidavit of Leslie Craig.  Mr. Craig had not been identified in Defendants' initial disclosures or supplemental discovery disclosures.  Further, there is much greater potential for prejudice if I were to allow the Craig Affidavit into evidence.  Plaintiff has not deposed Mr. Craig, and allowing his Affidavit into evidence may require reopening of discovery.  In contrast, because Dr. Quesnel is Plaintiff's witness, allowing Defendants' Cross-Motion to proceed will not require reopening of

who, with less than the trained facilities of the expert, is 'a purchaser of things of a similar design,' or 'one interested in the subject' ...one who, though not an expert, has reasonable familiarity with such objects." *Id.* at 1322 (citing *Applied Arts Corp. v. Grand Rapids Metalcraft Corp.*, 67 F.2d 428, 430 (6th Cir. 1933)).

In *Arminak,* the Federal Circuit held that "in applying the ordinary observer test, a court is to compare the construed claim to the accused design to determine whether 'the designs have the same general visual appearance, such that it is likely that the purchaser (or the ordinary observer) would be deceived into confusing the design of the accused article with the patented design.'" *Id.* at 1324 (quoting *Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co.*, 162 F.3d 1113, 1118 (Fed. Cir. 1998)).  This test requires "comparing … the accused and patented designs from all views included in the design patent, not simply those views a retail customer seeking to buy would likely see when viewing the product at the point of sale." *Id.*

Quesnel opines as to infringement of the three Design Patents and the single utility patent; *i.e.*, the '576 patent.  However, Quesnel does not claim any particular expertise with snow plows and thus does not qualify as an "ordinary observer" able to opine on the issue of infringement of the Design Patents, and he claims no expertise sufficient to opine on the issue of the '576 Patent.

By his own admission, he is someone who does not use or purchase snow removal products.  [Dkt. No. 89-2, Ex. A, Quesnel Tr. 56:21-57:5.]  Quesnel conceded at his deposition that he had never owned a snow pusher or snowplow, he had never operated a snow pusher or snowplow, he had never repaired a snow pusher or snowplow, he had never evaluated a snow pusher or snowplow for purchase by others and, other than operating a

discovery.

loader during the summer of 1971 when he was an undergraduate at SUNY Stony Brook, he had not operated any heavy equipment. [*Id.*] An ordinary observer is "a purchaser of things of a similar design," or "one interested in the subject … who, though not an expert, has reasonable familiarity with such objects …." *Applied Arts*, 67 F.2d at 430. The evidence shows that Quesnel does not qualify as an ordinary observer with respect to the products at issue in this case.

Plaintiff points to no facts sufficient to support Quesnel's experience in this field or sufficient to allow him to perform the ordinary observer analysis. Plaintiff argues that Quesnel is qualified in the field of mechanical engineering design. Plaintiff further asserts that "[h]is view on ornamental aspects of such devices is quite ordinary in that he, like others in the Rochester area, sees snow removal devices on a regular basis." [Dkt. No. 89-7, 32, Pl.'s Resp. to Defs.' Statement of Alleged Facts, November 23, 2008.] Considering Plaintiff's objections to Heyer on similar grounds, clearly Quesnel's New York residence alone is not sufficient to allow him to testify as to similarities of the Design Patents and the accused products.

Quesnel's Report is fundamentally flawed because he focused on one or two drawings of the Design Patents, and because he relied upon limited photographs taken from Pro-Tech's web site. Those photographs of the Pro-Tech products do not correspond with all of the views of the Design Patents. It is the appearance of a design as a whole which is controlling in determining infringement. *Contessa*, 282 F.3d at 1378. In particular, the ordinary observer analysis requires the patented design to be "viewed in its entirety, as it is claimed." *Id.* (citing *L.A. Gear, Inc. v. Thorn McAn Shoe Co.*, 988 F.2d 11 17, 1125 (Fed. Cir. 1993)).

In his Report, Quesnel seems to have focused exclusively on the gussets depicted in

each of the three Design Patents and seemingly nothing else.   Quesnel's opinions are unreliable because they are not based upon facts sufficient to reach the conclusions expressed.   Further, by focusing solely on the gussets, he proffers no facts that contravene those introduced by Heyer.   When asked about his methodology, Quesnel stated as follows:

> Q.      Okay, and is it, therefore, your opinion that you can make a determination as to the overall visual impression of a Pro-Tech product without looking at any other view other than the perspective view?
>
> A.      Yes.

[Dkt. No. 89-2, Ex. A, Quesnel Tr. 87:16-20].

According to Quesnel, because the photographs of the Pro-Tech products he reviewed have gusset features that "look like" the artwork from the patents, he concluded that the accused products infringe each of the three Design Patents.   His opinion and analysis did not encompass the visual appearance of the accused products as a whole and, for this reason alone, he did not base his opinions upon sufficient information.[9]   Defendants question whether Quesnel acknowledges that the three Design Patents are of varying scope, because he stated at page 3 of his Report that:   "[e]ach of the three patents … have identical claims." [Dkt. No. 89-2, Ex. B.]   However, at Appendix B to his Report, Quesnel reproduces Judge Telesca's claim construction for each of the three Design Patents, thus indicating that he was aware of the differences for each of the three Design Patents.   In his deposition, he also testified that he understood the significance of dashed or dotted lines in a design patent drawing.   [Dkt. No. 89-2, Ex. B, Quesnel Dep. 59:5-12.]   Specifically, Quesnel stated that "[t]he degree of dotted lines which exclude certain features of the image from being claimed was different."   [*Id.*]

---

[9]Plaintiff acknowledged at oral argument that its Design Patents were of different scope.   [Hr'g Tr. 48:22-49:15, 50:10-16.]   Thus, infringement of one does not compel a

Quesnel attached to his Report a series of photographs (Figures 3a-n) taken from Pro-Tech's Web site.   With respect to each model pusher, only a single size and single perspective view was included in his analysis.   At his deposition, Quesnel acknowledged that his design patent infringement analysis consisted exclusively of comparing the perspective view contained in each of the Design Patents with a perspective view for each of the allegedly infringing Pro-Tech model pusher using the images from the Web site, to wit,

> Q.   Let me ask you to take a look at Figure 2 of Deposition Exhibit #DQ-4, the 097 patent.  Is there a view on any of the photographs you examined of the Pro-Tech products that corresponds to the view on Figure 2 of the 097 patent?
> A.   No.
>
> Q.   Let me ask you to take a look at Figure 3 of Exhibit #DQ-4 which is the 097 patent.  Is there a view on any of the Pro-Tech photographs of any of the Pro-Tech products you examined that corresponds to the view on Figure 3 on the 097 patent?
> A.   No.
>
> Q.   Is there a view on any of the Pro-Tech images you reviewed in preparation for your report that correspond to Figure 4 of the 097 patent?
> A.   No.
>
> Q.   Is there a view on any of the Pro-Tech images that you looked at in preparation for your report that corresponds to Figure 5 of the 097 patent which is Exhibit #DQ-4?
> A,   No.
>
> Q.   Is there a view in any of the Pro Tech images you looked at in preparation for your report that corresponds to Figure 6 of the 097 patent?
> A.   No.
>
> Q.   How did you obtain an overall visual impression of the ornamental design of Pro-Tech's snow moving products?
> A.   From the plurality of pictures that are shown in the product brochure, shown in prospective.
>
> Q.   So you only show a prospective drawing or image, correct?
> A.   Correct.

conclusion that either of the others is infringed.

[Dkt. No. 89-2, Ex. A., Quesnel Tr. 81:14-82:20.]

Significantly, he never saw an actual product until after having finalized his Report, and even then he saw it at a distance through a fence and could not identify the model.  [Hr'g Tr. 34:8-12.]

In *Contessa*, the Federal Circuit held that

> [t]he absence of any consideration or comparison of the features of the [design] depicted in Figure 4 in the district court's analysis of 'the competing products' … reflects that [this view] of the patented … design was not part of the infringement analysis.  We conclude that this omission was erroneous.

*Contessa*, 282 F.3d at 1379.  The *Contessa* Court reversed a decision where the district court failed to analyze all of the design patent drawings.  Indeed, the *Contessa* Court specifically held that

> the 'ordinary observer' analysis is not limited to the ornamental features of a *subset* of the drawings, but instead must encompass the claimed ornamental features of all figures of a design patent.

*Id.* (emphasis added).

Here, Quesnel's analysis relied on less than all of the drawings of the Design Patents.

The Design Patents have multiple views which must all be considered when attempting to compare the overall impression of the Design Patents with that of the allegedly infringing products.    However, Quesnel examined views of the accused products corresponding to only one or two drawings of each Design Patent.  By his own admission, Quesnel confined his evaluation of the allegedly infringing products primarily to a single, perspective view of each of the allegedly infringing Pro-Tech models - models which are offered in various shapes, widths and sizes.  Moreover, he seemingly made no attempt to inspect or observe any of the accused products before he reached his conclusion that they infringed.  He lacked information with which to make a determination as to the overall

visual impression of either the patented designs or the allegedly infringing products.

Regarding the '576 Patent, Quesnel's Report and analysis are insufficient on their face. With respect to independent claim 1, Quesnel's Report only analyzes the gussets and makes no mention of the other features recited in the only independent claim of the '576 Patent. [Dkt. No. 89-2, Ex. B., Quesnel Rep., 7.] Quesnel's Report fails to identify the main blade, top edge, bottom edge, front and back surfaces, first and second sidewalls, the base edge or the smaller apex of each of the first and second gussets. [*Id.*] Quesnel concludes, without pointing to these features for each design, that "all models examined infringe upon Claim #1."[10] [*Id.*] Any infringement analysis requires a comparison of the construed claims to the accused product. *Contessa*, 282 F.3d at 1378. Quesnel's Report fails to make this required analysis. It is noted that Plaintiff has already conceded that the "Angled Model" having a single gusset does not infringe the '576 Patent. In this regard, Plaintiff has chosen to disagree with its own expert. For these reasons, it is recommended that Quesnel not be permitted to express an opinion or provide testimony regarding infringement of the Design Patents, the '576 Patent, or the accused devices.

## B.     Anthony F. Dannible, CPA

"The measure of damages in an infringement case is 'the difference between the patent owner's pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred.'" *Rosco, Inc. v. Mirror Lite Co.*, 506 F. Supp. 2d 137, 149 (E.D.N.Y. 2007) (quoting *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964)). The "lost profits" of the patent owner may in certain instances be recovered as the measure of damages. There must be adequate evidence in the record to recover lost profits, however. *Rosco, Inc.*, 506 F. Supp. 2d at 149. There are

---

[10]At oral argument, Plaintiff acknowledged that the Angle model did not infringe,

at least two potential methods of showing the "but for" causation necessary to recover lost profits, the four-factor test set out in *Panduit Corp.* v. *Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978) and the two-supplier market test set out in *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003).   The two-supplier market test is irrelevant in this case because the record establishes numerous suppliers of snow plows, and, as such, the four-factor Panduit factor test would seem to be the appropriate analysis.

In *Panduit,* the court held that a patent owner must establish, by a preponderance of the evidence, the following four factors to obtain entitlement to lost profits:  (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of the profit the patentee would have made.  *Panduit,* 575 F.2d at 1156.   In applying the Panduit analysis, it is appropriate to determine the unit sales and revenue that the patent owner would have made "but for" the alleged infringement, as well as the plaintiff's incremental costs that it would have incurred in making the lost sales.  *See BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.,* 761 F. Supp. 1032, 1039 (S.D.N.Y. 1991).   Should lost profits not be available or only partially available, then the statute sets the damages floor at "no less than a reasonable royalty."  35 U.S.C. § 284; *see also TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 898 (Fed. Cir. 1986).

For design patent infringement, the Patent Act itself expressly provides "... [an infringer] shall be liable to the owner to the extent of his total profit..." 35 U.S.C. § 289.  The expert report of Anthony F. Dannible, CPA, Plaintiff's damages expert, offers an opinion as to Degelman's lost profits due to the alleged patent infringement.  Dannible purports to apply the *Panduit* test.  According to Defendants, Dannible failed to properly employ the *Panduit*

thus contradicting Dr. Quesnel.

test to arrive at Degelman's lost profits.  [Dkt. No. 82, Defs.' Mov. Br., 20.]  According to Defendants, Dannible's analysis lacks sufficient data and utilizes a flawed analysis and methodology in arriving at his lost profits figures.  [*Id*.]  Defendants have submitted the affidavit of Kathleen M. Kedrowski of Navigant Consulting to support their position that Dannible's Report is fatally flawed.  According to an expert report attached as Exhibit A to her Affidavit, Dannible's opinion that there was a demand for the device covered by the '097 Patent product line was conclusory and unsupported by any facts or analysis.  [Kedrowski Rep. ¶¶ 28-32.]  Second, she states that Dannible improperly assumed that there were no acceptable non-infringing substitutes in the marketplace and, in fact, that he ignored relevant evidence to the contrary.  [*Id*. at ¶¶ 33-38.]  Third, she claims that Dannible made no analysis whatsoever of Plaintiff's manufacturing and marketing capability to exploit the demand identified in response to Factor No. 3 [*id*. at ¶¶ 39-45] and, fourth, that he did not properly calculate the amount of profits Degelman would have made but for the alleged infringement [*id*. at ¶¶ 46-49].

Ms. Kedrowski states that Defendants' incremental costs are irrelevant in determining Plaintiff's lost profits.  [*Id*. at ¶ 46.]  Further, Ms. Kedrowski states that Dannible used the wrong starting date for his calculation of damages and assumed that the alleged damages period began in January of 2003 rather than August of 2003 when the first patent-in-suit was issued.  [*Id*. at ¶ 47.]  The parties dispute the amount of financial information available to Dannible and his methodology given the data at his disposal.

Dannible is a founding member of the accounting firm, Dannible & McKee (founded in 1978).  He represents that he has been providing advice and services to businesses, and assessing profits, losses and damages for businesses, for over thirty years.  [Dannible Rep., Ex. C.]  Additionally, Dannible's credentials have been accepted by other courts in at least

half a dozen prior cases. [*Id.*] In my opinion, Dannible is qualified to present opinions on the damages sustained by Degelman as a result of Defendants' alleged infringement of Degelman's design and utility patents. Defendants criticize Dannible's opinions and use of Defendants' profits in his damages analysis. However, the Patent Act itself expressly allows such a methodology when it comes to damages for design patent infringement. 35 U.S.C. § 289 ("[an infringer] shall be liable to the owner to the extent of his total profit"). Plaintiff notes that Defendants' expert, Kathleen M. Kedrowski, failed to acknowledge Section 289 in her Report or during her deposition. [Dkt. No. 89, Pl.'s Opp'n, 24.] Therefore, neither party is satisfied with the methodology and opinions of the opposing damages experts.

If either expert did not properly apply the appropriate factors, the opposing party will be permitted to explore same during cross-examination at trial. The flaws in the analysis, if any, can then be weighed by the jury. The issues raised by Defendants go to the weight to be accorded Dannible's opinions, not their admissibility. For these reasons, it is recommended that Dannible be permitted to express an opinion and provide testimony regarding damages resulting from infringement of the Design Patents and/or the '576 Patent.

## IX.   CONCLUSION

It is therefore recommended that Mr. Godici and Mr. Douglas be allowed to testify on the subjects of PTO practice and procedures, but be precluded from testifying on the issues of patent validity and enforceability. It is further recommended that Mr. Heyer be permitted to testify to the experience of an ordinary observer, the appearance of the accused products, the appearance of the patented designs, and similarities and differences between them, but be precluded from testifying on the ultimate issue of infringement. It is also recommended that Mr. Leonard be precluded from presenting testimony and opinions on the issue of patent validity, but be allowed to testify on issues on design and fabrication of

reinforcing members for reinforcing welded joints, to the extent such testimony is relevant to issues of this case.  It is recommended that Dr. Quesnel not be permitted to express an opinion or provide testimony regarding the accused devices and infringement and validity of the Design Patents and the '576 Patent.  Finally, it is recommended that Mr. Dannible be allowed to testify as to damages.

Respectfully submitted,

Joseph W. Berenato, III
Special Master

May 27, 2011